UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MYRON C. GLENN,

               Plaintiff,                     Case No. 2:17-cv-10972
                                               District Judge George C. Steeh
v.                                         Magistrate Judge Anthony P. Patti

CORIZON HEALTHCARE, INC.;
DR. HARESH B. PANDYA, M.D.,

               Defendants.

_____/

## <u>REPORT AND RECOMMENDATION TO GRANT DEFENDANT CORIZON HEALTH, INC.'S MOTION FOR SUMMARY JUDGMENT (DE 27)</u>

## I.    RECOMMENDATION

The Court should **GRANT** Defendant Corizon Health, Inc.'s Motion for Summary Judgment.  (DE 27.)

## II.    REPORT

### A.    Procedural Background

Plaintiff Myron C. Glenn, a state prisoner who is proceeding *in pro per*, filed the instant lawsuit against Defendants Corizon Health, Inc. (Corizon) and Dr. Haresh B. Pandya.  (DEs 1, 12.)

Plaintiff filed his original complaint against Corizon on March 27, 2017 (DE 1); he added Dr. Pandya as a co-defendant in an amended complaint, accompanied

by a proper declaration, filed on September 1, 2017.  (DE 12.)  On October 25, 2018, after many failed attempts at service, Dr. Pandya appeared and waived the filing of an answer at that time.  (DE 57; *see also* DEs 35, 48.)   On November 8, 2018, Dr. Pandya filed a motion for summary judgment.  (DE 62.)  That motion has now been fully briefed (DEs 65, 66), and will be addressed in a separate report and recommendation.

On March 9, 2018, Corizon filed the instant Motion for Summary Judgment. (DE 27.)  On March 19, 2018, Plaintiff filed a motion for a ruling on Corizon's summary judgment motion to be postponed pending discovery, pursuant to Rule 56(d).  (DE 33.)  Plaintiff then filed his Opposition to Corizon's summary judgment motion on May 18, 2018, accompanied by a declaration.  (DE 43 at 3-4.)   Corizon filed its Reply on May 25, 2018. (DE 44.)  The Court subsequently granted Plaintiff's Rule 56(d) motion and gave Plaintiff 45 days (until November 5, 2018) to file a supplemental response brief, if needed.  (DE 54.)  Before then, on October 4, 2018, Plaintiff "concede[d] that he can present no more evidence and ask[ed] the court to proceed in the matters before [it]."  (DE 56.)  The Court understands this to mean that Plaintiff does not intend to file a supplemental response brief or has no need to obtain additional records.  (*See* DE 54.)   Accordingly, Corizon's Motion for Summary Judgment is ripe for review.  (DE 27.)

In the instant motion, Defendant Corizon argues that nearly all of Plaintiff's claims are barred by the statute of limitations, or alternatively, are incognizable as a matter of law under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (DE 27.)  In his Opposition, Plaintiff argues that his claims are not time-barred because they involve a "continuing violation," and that they are cognizable under *Monell*.  (DE 43.)  Corizon reiterates its position in its Reply.  (DE 44.)

### B.    Factual Background

The crux of Plaintiff's amended complaint is that Defendants were deliberately indifferent to his serious medical needs by delaying him access to an orthotic (or "orthopedic") boot that accommodates his ankle foot orthopedic brace. (DE 12.)

The Michigan Department of Correction (MDOC) contracted with Corizon to provide healthcare to Michigan prisoners during all times relevant to this lawsuit. (DE 12, ¶ 4; DE 50, ¶ 11.)  Corizon is responsible for reviewing and approving, denying or providing alternative treatment plans (ATPs) in response to its medical providers' Consultation Requests ("407 Requests") for offsite special appointments, including physical therapy and orthotic appointments.  (DE 50, ¶ 9.)  And although Corizon medical providers are responsible for *submitting* requests for items to the MDOC Regional Medical Officer (RMO) requiring RMO approval, such as for certain types of special footwear provided for medical reasons, the MDOC RMO is

responsible for *approving or deferring* those requests based upon the MDOC's guidelines. (DE 50, ¶ 8.) During that time frame, the MDOC had Medical Service Advisory Committee (MSAC) guidelines in place regarding the provision of special footwear for medical reasons (DE 27-3; DE 50, ¶ 6), and Dr. Pandya was the MDOC RMO during all times relevant to this lawsuit. (DE 27-3 at 56; DE 50, ¶¶ 3-4.) The MSAC guidelines provide that the MDOC RMO must give final approval before orthopedic (orthotic) shoes are specially made, which they "rarely" are. (DE 27-3 at 2.) This is a key distinction: Corizon reviews 407 Requests while the MDOC reviews RMO Requests.

By way of background, Plaintiff had his five toes amputated after his left foot was crushed when he was 13 years old. (DE 12, ¶ 12.) He has a skin graft that covers his left foot, from the forefront of his distal stump to the midway point running back to his ankle, as well as parts of the inside of his ankle. (*Id.*) Plaintiff's foot is essentially a "skin and bone distal stump," which is "abnormally shaped" after his injury and reconstructive surgeries. (*Id.* ¶¶ 13, 16.) According to Plaintiff, the condition of his left foot makes him chronically vulnerable to skin graft breakdowns (open sores that accumulate and have difficulty healing), infection, and hypersensitivity that includes "gripping pain when walking, standing, and sitting, with feet on the ground." (*Id.* ¶¶ 13-15) He also has a history of Osteomyelitis. (*Id.* ¶ 13.)

4

The MDOC issued Plaintiff an Ankle Foot Orthotic (AFO) brace and orthopedic boot to accommodate the brace back in early 1998. (*Id.* ¶ 18.) Plaintiff states that the AFO brace and boot help facilitate his balance, prevent skin graft breakdowns, decrease chronic infections, and reduce the extreme pain and discomfort by off-loading weight from hypersensitive areas of Plaintiff's foot injury, which in turn reduces friction caused by walking on the distal stump without the natural cushion of tissue and shock absorption of toes. (*Id.* ¶¶ 19-20.) The brace can be retracted from the boot to be cleaned and to have its padding adjusted. (*Id.* ¶ 21.) However, the brace's design also makes it easy for Plaintiff's foot to slip out of normal, non-orthopedic shoes, including those made by the prison and those that can be purchased at a retail store. (*Id.* ¶ 22.) In contrast, orthopedic boots are wider and softer; specifically, they are made of soft leather, with seams that are softer, and with an opening that is wider, than non-orthopedic alternatives. (*Id.* ¶¶ 23-24.)

Plaintiff states that, around late 2011 and early 2012, while he was housed at the Thumb Correctional Facility (TCF), his orthopedic boots became worn out due to normal wear and tear, and he made repeated requests for a new pair of shoes or boots. (DE 12, ¶¶ 26-27.) The nursing staff ordered athletic shoes for him. (DE 27-2 at 1-5.)

In early April 2012, Plaintiff was treated for a rash on his inner left calf from his AFO brace rubbing on his leg, and he was given a jersey sleeve to wear under

the brace with instructions to contact health care if it did not help him.  (*Id.* at 6-11.)

On April 10, 2012, Plaintiff reported he was "doing well and ha[d] no concerns or

questions."  (*Id.* at 12-14.)  In July 2012, Plaintiff sent kites requesting new athletic

shoes and for help with repairing his brace and a complaint of a sore on his foot from

the "brace malfunction," and he had an appointment with a nurse to address the

issues.  (*Id.* at 15-18.)

In September 2012, Plaintiff was seen in healthcare and treated for an

infection at his amputation site, and the physician assistant (PA) subsequently

submitted a 407 Request for Plaintiff to have an offsite visit at Duane Waters

Hospital (DWH) to obtain orthopedic footwear.  (DE 27-2 at 19-27.)  Plaintiff was

also given a new basin for soaking his feet.  (*Id.* at 28-29.)  Dr. Harriet Squire

responded to the 407 Request and provided an alternative treatment plan because "it

is not clear what the problem is with current shoes and what kind of AFO he has."

(*Id.* at 30-31.)  She noted a need to rule out osteomyelitis, instructed Plaintiff to be

non-weightbearing with crutches or a walker for a period of time, and to consider a

podiatry consult if the ulcer did not heal.  (*Id.*)  She also advised Plaintiff to wear

two pair of socks and dressing to reduce pressure to the wound, and advised the PA

to examine the AFO brace to determine if it was contributing to the problem.  (*Id.*)

Plaintiff met with Ramesh Kilaru, M.D. later in September for a "non-healing

ulcer" but had no sign of infection, and Dr. Kilaru advised Plaintiff to wear two

socks and use crutches until the ulcer heals. (DE 27-2 at 34-35.)   According to Plaintiff, Dr. Kilaru purportedly said Plaintiff's "orthopedic boot detail had been discontinued by [the RMO and] Corizon higher-ups due to budget cuts that affected all prisoners state-wide; 'It isn't just you,'" and that Corizon was going to start providing footwear made by the prison's Michigan State Industries (MSI) and/or footwear that was otherwise non-medical in order to save money and cut back on waste.  (DE 12, ¶¶ 27-31.)  When Plaintiff asked whether the non-orthopedic shoes would accommodate his AFO brace, Dr. Kilaru said: "I don't know, we'll just have to wait and see."  (*Id.* ¶ 32)  Dr. Kilaru also said that Plaintiff would have to wear non-orthopedic shoes on a trial-basis before he would be able to request orthopedic ones again.  (*Id.*¶ 33.)  Plaintiff states, however, that he "was experiencing minimal difficulty with the foot-wear and AFO he was receiving" "at that time."  (*Id.* ¶ 34.)

Plaintiff saw the nurse again for treatment of his wound on September 28, 2012, and was provided with a medical detail for crutches on October 1, 2012.  (DE 27-2 at 36-38.)  However, Dr. Kilaru noted on October 18, 2012 that Plaintiff had been non-compliant with using crutches without a shoe and instead just kept walking in shoes, and he ordered labs and a follow-up visit after receiving the lab results.  (*Id.* at 39-42.)  After receiving the lab results, Dr. Kilaru submitted a 407 Request for a podiatry consult, which was approved.  (*Id.* at 43-46.)

Plaintiff had his podiatry consult on December 14, 2012 with Mathew A. Page, DPM, who determined that Plaintiff did not have signs of osteomyelitis and recommended wound care and a referral to the orthotist for evaluation for new boots to accommodate his brace.  (DE 27-2 at 47.)  On December 21, 2012, Michael Brostoski, D.O. submitted a 407 Request for fitting of orthotic boots with DWH orthotics, which was approved on December 26, 2012.  (*Id.* at 48-51.)  In a follow-up visit with Dr. Brostoski in January 2013, the doctor noted that Plaintiff's wound had healed, and Plaintiff reported that he had no complaints.  (*Id.*at 52-53.)

Plaintiff states that he was transferred to Chippewa Correctional Facility (URF) in early 2013, and then transferred three weeks later to Jackson Cotton Correctional Facility (JCF).  (DE 12, ¶¶ 39, 42.)

On February 24, 2013, Shanthi Gopal, M.D. submitted an RMO Review request for Epsom salt, Vaseline and high top orthotic boots.  (DE 27-2 at 55.)  Dr. Pandya deferred the request that same day, requesting more information.  (*Id.* at 56.) Plaintiff had his orthotics appointment on February 28, 2013, and the orthotist evaluated Plaintiff for "left AFO adjustment" and determined that it was not possible to adjust Plaintiff's AFO without causing other problems.  (*Id.* at 57.)  The orthotist casted Plaintiff for a left partial foot gauntlet and requested a follow-up appointment. (*Id.*)  The next day, Dr. Gopal submitted another RMO Review request for Epsom

salt, Vaseline and high top orthotic boots (*id.* at 58), which Dr. Pandya subsequently approved.  (*Id.* at 59.)

On March 10, 2013, Dr Gopal submitted a 407 Request for a follow-up orthotics appointment for "fitting of the left partial foot brace/prosthesis," which was approved.  (DE 27-2 at 60-63.)  At the March 21, 2013 appointment, the orthotist advised that Plaintiff would need another follow-up appointment for final delivery of the orthotic device.  (*Id.* at 64.)  Plaintiff had a follow-up visit with the orthotist on June 20, 2013, at which time the orthotist determined that the orthotic device needed "to be sent to the manufacturer for internal adjustment and to relieve pressure" and that another follow-up appointment was necessary.  (*Id.* at 65.)

In June 2013, Plaintiff had received new MSI shoes, but he complained that they were "the wrong shoes" and that he cannot fit his AFO brace into the shoe.  (DE 27-2 at 66-67.)  Plaintiff states that the shoes caused extreme pain and rasping against the skin-graft from the friction created while walking.  (DE 12, ¶ 37.)  Dr. Gopal submitted a request to the RMO for shoes, explaining that the high-top boot provided by the quartermaster was not similar to Plaintiff's current boot and did not accommodate the AFO, and that he needed approval for "the similar brand he is currently using and which fits his AFO – Columbia Black 10.5 size."  (DE 27-2 at 67-68.)  Dr. Pandya deferred the request and suggested instead that Plaintiff try a size 11 or 12 high top boot from the quartermaster.  (*Id.* at 69.)

Plaintiff had his next orthotic appointment on July 18, 2013, after the manufacturer had made adjustments to his left gauntlet brace, and Plaintiff reported that the brace felt good but that he would wait until an infection on his foot cleared up before wearing the brace.  (DE 27-2 at 70.)  Plaintiff had a follow-up orthotics appointment on August 1, 2013, at which time the orthotist stated that the "current MSI athletic shoes is [sic] totally broken down and was not able to accomodate [sic] the patient/prisoner AFO," and advised that Plaintiff would need another follow-up appointment after receiving approval for orthopedic boots.  (*Id.* at 73.)  Dr. Gopal submitted another 407 Request for high top boots on August 2, 2013 (*id* at 71-72), and Erin Orlebeke, M.D. responded on August 5th with an alternative treatment plan: "This 407 is not necessary as a request for MSI hi-top boots is accomplished via RMO off formulary request.  Please forward that request to your MDOC RMO." (*Id.* at 74-75.)

Dr. Gopal submitted a 407 Request for the orthotics fitting for a "new pair of orthopedic high top boots/with extra depth" on August 8, 2013.  (DE 27-2 at 76-77.) Dr. Orlebeke responded with an alternative treatment plan, directing the medical provider to instead submit a request for a "single visit to PT for evaluation."  (*Id.* at 80-81.)  On September 6, 2013, Jennifer Wierman, N.P., submitted another 407 Request for an orthotic boot, and  Dr. Orlebeke responded again with an alternative treatment plan to "expedite submitting a 407 for a PT evaluation."  (*Id.* at 82-83, 88-

10

89.)   On September 12, 2013, NP Wierman submitted the single-visit physical therapy 407 Request that Dr. Orlebeke suggested, which Dr. Orlebeke approved. (*Id.* at 90-91, 93-94.)

Plaintiff saw PT Emmanuelle Genna on September 13, 2013, who noted that Plaintiff stated that "he developed the scab [on the distal end of transmetatarsal amputation] from wearing his shoes without his AFO donned.  He states that he does not wear his AFO brace because he does not have a pair of shoes that the AFO will fit into.  Client is wearing his AFO that fits appropriately into the high top Propet shoes. The shoes are worn but intact and wearable." (DE 27-2 at 95-96.)  PT Genna provided a tracing of Plaintiff's foot with the AFO in place "so that a pair of MSI shoes may be ordered for him." (*Id.*)

On December 23, 2013, NP Wierman submitted another 407 Request for an orthotics fitting (DE 27-2 at 100-08), and Steven Bergman, D.O., responded on December 28, 2013 with an alternative treatment plan, finding that "[m]edical necessity for an orthopedic boot is not demonstrated at the present time" and instructing the medical provider to measure Plaintiff's foot with the AFO in place and work with the MDOC Health Unit Manager to order a custom-made boot from MSI. (*Id.* at 109-11.)  NP Wierman documented on December 30, 2013 that Plaintiff already had shoes from the physical therapy tracing, and that he "had been treated multiple times for infection of his grafted skin to this stump.  [Plaintiff] continuously

11

given not properly fitted shoes that cause issues with his foot." (*Id.* at 111.) However, she also noted that Plaintiff had been ordered to come to healthcare every night for Epsom salt soaks and Vaseline, but that he had not come over the last eight days. (*Id.*) NP Wierman again submitted a 407 Request for orthotics on January 3, 2014 (*id.* at 113-14) and Dr. Bergman responded with the same alternative treatment plan as before. (*Id.* at 115-16.)

On January 24, 2014, Wendy Liu, N.P. submitted a 407 Request for orthotics fitting for a "new high top SUREFIT boot fitted to accommodate his AFO," and included additional details and photographs of Plaintiff's foot ulcer. (DE 27-2 at 117-18.) Keith Papendick, M.D. approved the request that same day. (*Id.* at 122-23.)

Plaintiff had his orthotics visit on February 13, 2014, at which time the orthotist delivered his high top shoes. (DE 27-2 at 124.) The fit of the shoes was "acceptable" and Plaintiff reported that he "is happy with them." (*Id.*) On March 3, 2014, Plaintiff reported in a follow-up visit with NP Wierman that he had "much improvement from the boots" and that he reported "great relief" and "less pain." (*Id.* at 125-28.)

However, Plaintiff complains that his complications persisted. He states that he began experiencing back pain and sciatica as a result of overcompensating for his foot pain by putting more strain on his back. (DE 12, ¶ 51.) According to Plaintiff, in November 2014, he was diagnosed with both Methicillin-resistant Staphylococcus aureus (MRSA) and Osteomyelitis; he was told this was due to his skin being infected and constantly exposed, and his oral antibiotics becoming ineffective. (*Id.* ¶ 59.) He was hospitalized for two months and placed on I.V. antibiotics, but the distal stump could only create a thin layer of healthy tissue, and he was treated with antibiotics for another tissue infection within a week of being discharged from the hospital. (*Id.* ¶¶ 59-63.) Plaintiff alleges irreparable damage has been done. (*Id.* at 10.)

Plaintiff claims that Corizon had "a state wide policy, custom, and practice of not providing prisoners with orthopedic or medically issued shoes or boots, and takes a categorical approach to issuance of said footwear," and that it "discontinued Plaintiff's orthopedic boots as a cost savings measure rather than a medical decision." (DE 12, ¶¶ 68-69.) He also complains that Corizon had "policies, customs, and practices … of delaying, and denying the provisions of necessary specialty referals [sic], consults, treatment and orthopedic footwear for [him]." (*Id.* ¶ 72.)

## C.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no *genuine dispute* as to any *material fact* and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  A fact is "material" if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute cannot be "genuine" if a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 248.

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted).  But "[o]nce the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also*  Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  And the nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The

nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotations and citations omitted).

To that end, any party asserting that a fact is or is not "genuinely disputed must support their assertion by (A) citing to particular parts of materials in the record, including . . . affidavits or declarations, . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute" of fact, or showing that the adverse party "cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A cited affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.  *Id.* at 56(c)(4).  While unsworn declarations generally cannot be used to support or oppose a motion for summary judgment, there is a statutory exception.  *Pollock v. Pollock*, 154 F.3d 601, n.20 (6th Cir. 1998); 28 U.S.C. § 1746.  Unsworn declarations can substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury, certified as true and correct, signed and dated.  *Id.*[1]

---

[1] In the instant motion, Plaintiff forgot to fill in the date he executed the declaration in support of his amended complaint; however, rather than elevate form over substance, the Court will take notice that it must have been at or very close to its filing date, September 21, 2017.  (DE 12 at 11.)  Plaintiff also filed a verification in support of his response to the instant motion.  (DE 43 at 3–8.)

Ultimately, though, summary judgment is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") The Court must view "all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

Either way, the fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56. Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006). In addition, "[o]nce a case has progressed to the summary judgment stage . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

### D.     Discussion

#### 1.     Statute of Limitations

For § 1983 claims alleging a personal injury, the state personal injury statute of limitations applies. *See Wilson v. Garcia*, 471 U.S. 261, 280 (1985); 42 U.S.C. § 1988 (providing that the limitations period for all § 1983 claims is the one most analogous state statute of limitations). Accordingly, under Michigan law, the personal injury statute of limitations is three years. MCL 600.5805(2) ("injury to a person or property"). Section 1983 claims are also tolled while plaintiffs exhaust their administrative remedies, which they are required to do. *Surles v. Andison*, 678 F.3d 452, 454–455 (6th Cir. 2012); 42 U.S.C. § 1997e(a). Although the *duration* of the statute of limitations is governed by state law, federal law governs when the statute *begins* to run. *See Wilson,* 471 U.S. at 267; *Sevier v. Turner,* 742 F.2d 262, 272 (6th Cir. 1986). Ordinarily, the statute of limitations begins to run once the injury is discovered. *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003). However, if the cause of action involves a "continuing violation," the cause of action begins to run once the harm ceases. *Id.*; *Hughes v. Lake Superior & Ishpeming*, 688 N.W.2d 296 (Mich. Ct. App. 2004). For example, the Sixth Circuit has held that plaintiffs alleging a "longstanding and demonstrable policy" of discrimination can apply the continuing violation doctrine. *Sharpe*, 319 F.3d at 267 (Title VII claims).

The continuing violation doctrine applies to § 1983 claims where: "(1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful

conduct, further injury would have been avoided." *Broom v. Strickland*, 579 F.3d 553, 555 (6th Cir. 2009). For example, the Eastern District of Michigan has held that the continuing violation doctrine applies to repeated failure to treat "chronic" medical needs. *Ellis v. Vadlamundi*, 568 F.Supp.2d 778 (E.D. Mich. 2008) (Lawson, J.) (holding that a chronic medical condition is "properly identified as 'ongoing,' and a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it"); *Moore v. U.S.*, 2011 WL 3568763, at *1, *8 (E.D. Mich. Aug. 12, 2011) (Roberts, J.) ("Because Plaintiff alleges that FCI-Milan employees continuously failed to treat his chronic medical needs, Plaintiff states a claim sufficient to warrant tolling under the continuing violations doctrine; his claims are timely."); *McAdory v. Engelsgjerd*, 2010 WL 1131484, at *4 (E.D. Mich. Feb. 11, 2010), *report and recommendation adopted at* 2010 WL 1132548 (E.D. Mich. Mar. 23, 2010) ("In cases involving a failure to treat such a chronic condition, the courts have held that prison officials may not parse for timeliness each individual treatment decision.").

Courts in this (and other) districts have essentially distinguished deliberate indifference to an "ongoing" medical condition, where the doctrine is applicable, from deliberate indifference to "discrete" events, where the doctrine is inapplicable. *See Ellis*, 568 F.Supp.2d at 783 (distinguishing discrete events from other circumstances where the issue may not become "grievable" until the passage of

18

time); *Lee v. Eddy*, 2014 WL 4829650 at *3 (S.D. Ohio Sept. 29, 2014) ("While the discontinuation of hormone therapy was an individual event, the continued lack of care for her physical and mental health needs demonstrates Defendant's neglect to remedy or attempt to remedy an ongoing medical condition."); *see also McCormack v. Burnett,* No. 12–CV–925–BBC, 2013 WL 5408260, *2 (W.D. Wisc. Sept. 25, 2013) (distinguishing ongoing inadequate medical care, which the continuing violation doctrine applies to, from a discrete medical issue, which the doctrine does not apply to).

The Sixth Circuit recognized this distinction between the ongoing and the discrete in *Siggers v. Campbell*, where plaintiff argued the withholding of his mail was a continuing violation. 652 F.3d 681, 692–93 (6th Cir. 2011). In denying this argument, the Sixth Circuit distinguished the plaintiff's situation from the situation in *Ellis*, by noting that "the Notices of mail rejection that [plaintiff] identifies are each discrete events, and each Notice involves separate facts and circumstances." *Id.*

The rationale for the distinction is this:

> For an acute medical condition, like a heart attack or a diabetic coma, the time of the failure to treat (and therefore the time of the Eighth Amendment violation) can be determined with some precision, and therefore the time limit for filing a grievance can be readily established. Such is not the case for a chronic medical condition that is ignored, or for which treatment is delayed or inadequate. *The seriousness of a chronic condition may not become obvious to prison officials until some time passes, and the indifference to that condition—and the resulting pain*

19

> *suffered by the prisoner that equates to the infliction of*
> *punishment—may not become manifest until then as well.*
> Such a condition is properly identified as "ongoing," and
> a grievance that identifies the persistent failure to address
> that condition must be considered timely as long as the
> prison officials retain the power to do something about it.

*Ellis,* 568 F.Supp.2d at 783–84 (emphasis added); *see also Ketzner v. Douglas,* 2009 WL 1655004, at *12–*13 (E.D. Mich. June 11, 2009) (Cohn, J., adopting Report and Recommendation of Hluchaniuk, M.J.).

Here, the relevant limitations period is three years. *Wilson*, 471 U.S. at 280; 42 U.S.C. § 1988;  MCL 600.5805(2).  This limitations period was admittedly tolled for an additional 104 days while Plaintiff pursued appropriate administrative remedies, from January 30, 2014–May 14, 2014 (DE 27 at 13).  *Surles*, 678 F.3d at 454–55; 42 U.S.C. § 1997e(a).  The key question is whether the continuing violation doctrine also applies.

In this case, it does, because Plaintiff complained of ongoing, chronic injury as opposed to independent, discrete injuries.  Strikingly, nearly every medical record that Corizon includes in Exhibit B characterizes Plaintiff's medical condition as "Chronic."  (*See, e.g.*, DE 27-2 at 3 ("Chronic Problems: [u]lcer, chronic, skin NOS, [a]mputation, traumatic, foot."); at 8 ("Chronic disease current"); at 12 ("Chronic Care Visit"); at 21 ("Chronic Problems"); at 25 ("Chronic Problems"); at 33 ("Diagnoses: [u]lcer, chronic, skin NOS"); at 34 ("Chronic Problems"); at 39 ("Chronic Problems"); at 40–41 ("he has a chronic ulcer on his foot"); at 43

("Enrolled in Chronic Care Clinic . . . [for] Left Foot Partial Amputation"); *see also id.* at 48, 50, 52–62, 66–71, 74–84, 87–102, 105–06, 111, 114–22, and 125).

Like the plaintiff in *Ellis*, Plaintiff complained of chronic (persistent, long-term) pain—as well as constant ulcers and infections and complications—as a result of the diagnosed condition of his amputated foot. 568 F.Supp.2d at 779–80. Consequently, he was also confined to a wheelchair. *Id.* at 779. Like the plaintiff in *Moore*, Plaintiff continuously complained about his condition, but was offered conservative treatments. 2011 WL 3568763, at *2. Thus, the pain progressively worsened. *Id.*

The conceptual difficulty lies here: prolonged events are, in a sense, comprised of individual events. But, like the discontinuation of hormone therapy in *Lee*, even if the discontinuation of Plaintiff's boot "was an individual event, the continued lack of care for his physical . . . needs demonstrates Defendant's neglect to remedy or attempt to remedy an ongoing medical condition." 2014 WL 4829650, at *3 (S.D. Ohio Sept. 29, 2014). And, unlike the plaintiff in *Siggers*, who alleged his mail was being withheld, Plaintiff alleges a single harm—not a dozen discrete harms, each subject to its own exhaustion requirements. 652 F.3d at 692–693. In *Siggers*, the Sixth Circuit distinguished a contrary Fifth Circuit case, which found it unrealistic to expect plaintiff to file a new grievance every time an assault occurred. *Id.* (citing *Johnson v. Johnson*, 385 F.3d 503, 519 (5th Cir. 2004) (finding repeated

21

sexual assaults over the course of eighteen months to be a continuing violation)). Tellingly, Corizon does not allege here that Plaintiff should have filed multiple grievances; to so argue would be non-sensical under these circumstances.  And undoubtedly, had Plaintiff grieved each and every medical care appointment, Defendant would have argued that each instance was a mere negligence claim, as the alleged *indifference* to his medical needs only becomes clear over the long haul.

The conclusion that Plaintiff suffered from a continuing violation is further supported by the policy underlying the continuing violation doctrine.  That is, when "[t]he seriousness of a chronic condition may not become obvious to prison officials until some time passes, [] the indifference to that condition . . . may not become manifest until then too."  568 F.Supp.2d at 783–84.  Much unlike "a heart attack or a diabetic coma, where the failure to treat can be determined with some precision, [s]uch is not the case for a chronic medical condition that is ignored, or for which treatment is delayed or inadequate."  *Id*.  This rationale is wholly consistent with the "wait and see" approach applied to Plaintiff's medical treatment.  (DE 12 at 5 (indicating that Plaintiff would have to wear non-orthopedic shoes on a trial-basis); 27 at 27 (acknowledging that Plaintiff would have to try some alternative footwear options first).)  The passage of time made Plaintiff's harm clear.  This policy directly explains why, as Corizon notes (DE 44 at 2), the continuing violation doctrine regularly applies to Title VII claims—the passage of time can make the harm clear.

22

*See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 526 U.S. 101 (2002) (Thomas, J. ) (holding that hostile work environment claims, which are actionable under Title VII, involve unlawful employment practices that occur over a series of days or years). Accordingly, Plaintiff states a claim sufficient to warrant tolling under the continuing violation doctrine.

Under the continuing violation doctrine, the three-year limitations period began to run when the harm ceased. It was also tolled 104 days, while Plaintiff exhausted his administrative remedies. Arguably, the harm to Plaintiff did not cease when he was given orthopedic boots in February 2014, because he was diagnosed with both MRSA and Osteomyelitis in November 2014 as a result of his skin being constantly infected and exposed, and his oral antibiotics becoming ineffective. (DE 12, ¶ 59.) Not only was he hospitalized for two months, but he was also treated within a week of being discharged from the hospital. (*Id.* ¶¶ 59-63) Regardless, it is not necessary to determine the exact date when the harm ceased, because his Complaint was filed in March 2017, which is within 3 years plus 104 days of February 2014, when he finally received an orthopedic boot. (DE 1.) Therefore, Plaintiff's claims are not time-barred.

### 2. *Monell* claim

It is well established that a prisoner has a cause of action under 42 U.S.C. § 1983 against prison officials for "deliberate indifference" to his serious medical

needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In *Monell v. Department of Social Services of the City of New York.*, the Supreme Court held that Congress intended for municipalities and other local government units to be included among those "person[s]" to whom § 1983 applies. 436 U.S. 658, 690 (1978); *see* 42 U.S.C. § 1983 ("Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or *causes* to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." (emphases added)).

To prevail in a § 1983 claim against a municipality, a plaintiff must show that the corporation had a "policy" or "custom" that caused the plaintiff's injury. *Monell*, 436 U.S. at 694. Specifically, a plaintiff must "identify the policy, connect the policy to the city itself[,] and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1994) (internal quotation marks and citations omitted). Although *Monell* addresses "municipal" liability specifically, it is well-established that § 1983 liability under *Monell* can also attach to "a private entity that contracts to perform traditional state functions." *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). The parties do not dispute that *Monell* applies to Corizon in this case.

24

Although numerous Corizon medical personnel were directly involved in Plaintiff's allegations in this lawsuit, and Plaintiff's allegations regarding some of those individuals' medical treatment (or lack of treatment) of Plaintiff is troubling, those individual medical providers (with the exception of MDOC employee Dr. Pandya) were not named as defendants herein. Rather, Plaintiff contends that Corizon is responsible for the collective actions of the individual medical providers. (*See* DE 12.) However, Corizon, like a municipality, "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, [Corizon] cannot be held liable under § 1983 on a *respondeat superior* theory." *Bright v. Gallia Cty.*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Monell*, 436 U.S. at 691). Rather, "[i]t is only when the execution of the government's policy or custom … inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (internal quotation marks and citation omitted); *see also Monell*, 436 U.S. at 694. In other words, Corizon's policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of [Corizon] under § 1983." *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694.)

A plaintiff "bears a heavy burden in proving municipal liability." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1)

the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified the illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). An unwritten or informal practice can be a basis for liability under § 1983 and *Monell*, provided that it amounts to "a pervasive custom or practice" of which the defendant's policymakers "know or should know," or is otherwise "attributable" to the defendant. *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014) (internal quotation marks and citations omitted).

In this case, Plaintiff contends in his Amended Complaint that Corizon had a custom or practice of "discontinuing Plaintiff's orthopedic boots as a cost saving measure rather than a medical decision" and of "delaying, and denying the provisions of necessary specialty referals [sic], consults, treatment and orthopedic footwear for Plaintiff." (DE 12, ¶¶ 71-72.) He maintains in his response to Corizon's motion for summary judgment that the following evidence demonstrates this policy or custom: (1) his medical providers made numerous 407 Requests for proper footwear over a two-year period which were "continuously denied/deferred," "clearly warning Corizon officials of the serious need for proper footwear and the risk associated with the lack thereof;" and (2) none of the denials were appealed to the Medical Services Advisory Committee (MSAC). (DE 43 at 31-32.) Plaintiff

believes that "[a]ny single given appeal, would have placed [his] serious medical needs before a panel of officials and given [him] a drastically higher chance of avoiding the irreparable harm he ultimately incurred." (*Id.* at 32.)  However, this "evidence" Plaintiff relies on fails to establish a custom or practice sufficient to establish liability under *Monell*.

First, Plaintiff has provided no evidence that a Corizon *official* policy was deliberately indifferent to his serious medical needs, but instead seems to assert a *Monell* claim under a "custom of tolerance or acquiescence of federal rights violations" theory.  (*See, e.g.,* DE 43 at 5 (alleging that Corizon "had a custom and practice"), 19 ("it was the policy, custom and practice of Corizon employees to follow (ATP) treatments without filing needed appeals"), 32 (acknowledging that "there may not be a written policy" but instead a "custom and practice" of not filing appeals), 35 (alleging that Corizon "create[d] a custom and practice"), 27 (referring to a Corizon "practice and custom" to try alternative treatment plans)).  In cases, such as this, "where no formal policy exists, the critical question is whether there is a particular custom or practice that although not authorized by written law or express municipal policy, is *so permanent and well settled as to constitute a custom or usage with the force of law*."  *Jones v. Muskegon Cty.*, 625 F.3d 936, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007) (internal quotation marks and citation omitted, emphasis added)).  In such a case, a

plaintiff must also show a direct causal link between the custom and the constitutional deprivation. *McClendon*, 255 F. App'x at 982.

It is well settled that the Court cannot find "notice of a pattern of misconduct or the pattern itself *solely* from the mistreatment *of the plaintiff*." *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir 2015) (emphasis added) (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005)); *see also Northington v. Abdellatif*, No. 16-12931, 2018 WL 3688665, at *10 (E.D. Mich. Aug. 3, 2018) (requiring "a pervasive pattern of such conduct that affected inmates *other than Plaintiff himself*" to support a deliberate indifference claim under *Monell*) (emphasis added). Courts have reasoned that "[t]o do so risks 'collapsing … the municipal liability standard into a simple *respondeat superior* standard," which is prohibited. *Nouri*, 615 F. App'x at 296 (quoting *Thomas*, 398 F.3d at 432-33 (plaintiff's evidence of a pattern was based on the facts of his own case, which threatened to collapse the municipal liability standard into one based on *respondeat superior*)). As stated above, Plaintiff "only has [*his*] experience on which to rely, and that is not enough to state a claim against [Corizon]." *Id.*; *see also Burgess*, 735 F.3d at 478-79 (plaintiffs failed to set forth any facts that there were prior instances of similar misconduct and thus "they simply have not demonstrated a pattern of inadequate investigation of similar claims as required"); *Wilber v. Cty. of Jackson*, No. 13-cv-14524, 2016 WL 892800, at *10 (E.D. Mich. Mar. 9, 2016) (dismissing *Monell* claim

where plaintiff failed to identify any prior incidents of deliberate indifference involving *other prisoners*).

While Plaintiff broadly claims in his Amended Complaint that "Corizon has also arbitrarily discontinued providing shoe details to other prisoners who had previously received them, under the MDOC healthcare system" (DE 12, ¶ 67), he has failed to identify *any* such prisoner(s) or produce *any* summary judgment evidence in support of that conclusory statement. Accordingly, he has not set forth any facts that there were prior instances of similar misconduct and thus he has failed to demonstrate a pattern of such unconstitutional conduct. For example, in *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), the court found that plaintiff established a policy or custom of deliberate indifference because the plaintiff presented evidence of 14 separate instances where the prison failed to investigate similar claims of prisoner mistreatment involving other prisoners. *See id.* at 1247-48 (noting that the lower court found that "at least 14 other paraplegics had received similar deplorable treatment"). However, other courts have distinguished *Leach* and found no evidence of a "widespread and permanent" custom or practice where the plaintiff fails to offer "other instance" evidence, or even offers limited "other instance" evidence. *See, e.g., Gale v. O'Donohue*, No. 17-12172, 2018 WL 618739, at *4 (E.D. Mich. Jan. 30, 2018) ("[I]solated evidence of a few allegedly suspicionless stop and frisks is insufficient to demonstrate a custom that is "so

29

widespread, permanent, and well settled as to have the force of law"); *Wilber, supra*, 2016 WL 892800, at *10 (plaintiff failed to identify any prior incidents); *see also Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding that the eleven incidents of warrantless searches were not enough to support a claim for a pattern of illegality in "one of the nation's largest cities and police forces" as the size of alleged constitutional violations was too small).

Further, Dr. Kilaru's alleged statements to Plaintiff that "his orthopedic boot detail had been discontinued by Corizon higher-ups due to budget cuts that affected all prisoners state wide" and that "Corizon was shifting to providing footwear made by the prison Michigan State Industries ("MSI") and/or other non-medical footwear" because "[t]hey are trying to save money and cut back on waste. You guys waste a lot" (DE 12, ¶¶ 29-31) do not demonstrate any purported "widespread and permanent" custom or practice by Corizon, but only an alleged statement made by one employee. *See Jones*, 625 F.3d at 947 (nurse's statement that inmates are "not supposed to feel good" did not demonstrate a custom by the County Jail, "only an unfortunate statement by one prison employee"); *see also Gale*, 2018 WL 618739, at *4 (lieutenant's alleged statements that suspicionless stops happen "all the time" and that it is police department policy to detain individuals in response to 911 calls indicating open intoxication fail to demonstrate a widespread and permanent police department custom); *Wright v. J&S Extradition Servs., LLC*, No. 3:11-0464, 2012

WL 1078981, at *7 (M.D. Tenn. Mar. 30, 2012) (county employee's statement that "it was her custom and practice not to investigate third party contractors, as she goes on the 'honor system'" does not demonstrate that the County had a permanent and well-settled custom or deliberate indifference through its failure to investigate contractors). As explained above, Corizon "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694.

There is simply nothing in the record that would permit a reasonable juror to conclude the Corizon has a policy or custom of indifference so "widespread, permanent and settled as to have the force of law" that led to Plaintiff's claimed injury, and Corizon is entitled to summary judgment.

### E.     Conclusion

For the reasons stated above, the Court should **GRANT** Defendant Corizon Health Inc.'s Motion for Summary Judgment. (DE 27.)

## III.     PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to

raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 18, 2019          s/*Anthony P. Patti*
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE

32

**<u>Certificate of Service</u>**

I hereby certify that a copy of the foregoing document was sent to parties of record on January 18, 2019 electronically and/or by U.S. Mail.

s/Michael Williams_____
Case Manager for the
Honorable Anthony P. Patti
